PILGRIM INSURANCE COMPANY *vs.* MARSHA M. MOLARD.

No. 07-P-1676.

Worcester. May 15, 2008. - December 16, 2008.

Present: McHUGH, DREBEN, & MILLS, JJ.

*Motor Vehicle,* Insurance. *Insurance,* Motor vehicle insurance, Uninsured motorist, Coverage, Construction of policy, Notice. *Contract,* Insurance. *Statute,* Construction. *Notice,* Timeliness.

In a civil action brought against an insurer by an eighteen year old plaintiff seeking uninsured motorist benefits under a automobile insurance policy issued to the plaintiff's mother, with whom the plaintiff was living when she was injured in an automobile accident while riding in a taxicab, the trial court judge erred in ordering entry of judgment declaring that the insurer was not liable under the policy, where genuine issues of material fact precluded entry of judgment for either party, specifically, whether the plaintiff had and fulfilled a duty to gather identifying information about the taxicab driver [331-336] and whether the plaintiff's late notice of the accident materially degraded the insurer's ability to conduct an appropriate investigation of her claim [336-339].

CIVIL ACTION commenced in the Superior Court Department on December 8, 2004.

The case was heard by *Jeffrey A. Locke,* J., on motions for summary judgment.

*Paul J. Franco* for the defendant.

*James P. McLarnon, Jr.,* for the plaintiff.

McHUGH, J. Marsha M. Molard, then eighteen years of age and living with her mother, Marie Puverge, was injured in an automobile accident while riding in a taxicab on October 16, 2002. Because she could identify neither the taxicab driver nor the driver of the other vehicle involved in the accident, she filed a claim with Pilgrim Insurance Company (Pilgrim) seeking uninsured motorist benefits under a standard Massachusetts automobile insurance policy, seventh edition (policy), that Pilgrim

had issued to Puverge. Pilgrim declined coverage and, on cross motions for summary judgment in the ensuing lawsuit, a judge of the Superior Court ordered entry of judgment declaring that Pilgrim was not liable under the policy. We conclude that genuine issues of material fact precluded entry of judgment for any party and, therefore, reverse.

1. *Background.* The summary judgment record shows that on the afternoon of October 16, 2002, Molard called the Yellow Cab Company (Yellow Cab) and hired a taxi to take her from downtown Worcester to her home in Auburn. In due course, a taxi arrived, picked her up and headed south toward Auburn on Route 290, a major highway connecting Interstate Route 495 with Interstate Route 90, the Massachusetts Turnpike. The driver had received Molard's destination from the Yellow Cab dispatcher, so she did not have to tell him where to go.

At about 3:30 P.M., the driver left Route 290 at the Hope Avenue exit and drove through an off-ramp yield sign into the rear end of a Dodge Caravan minivan (minivan) that had stopped to wait for passing traffic on a road into which the off-ramp merged.[1] The impact threw Molard forward and backward, her head hitting the front passenger seat and her neck hitting the back seat in which she was sitting. No other passengers were in the taxicab.

After the accident, Molard remained in the taxicab while the driver, a white male who wore glasses and had "greyish-brownish hair," got out to speak to the driver of the minivan. Molard did not see the two exchange any written information, although she heard the taxi driver say that there was not much property damage. The police were not called to the scene, and a police report was never filed.

After the two drivers spoke, they returned to their respective vehicles, the minivan driver departing for parts unknown and the taxi driver proceeding to Molard's home, where he dropped her off and left. Molard did not obtain the driver's name, nor did she obtain a license plate or medallion number for the cab.

---

[1]That description of the accident is the description Molard gave Pilgrim during an oral examination under oath. Although Molard's testimony contradicts the version of the accident contained in claim notices her attorney gave Pilgrim, Molard's testimony is the only admissible evidence in the summary judgment record regarding how the accident occurred.

The record contains conflicting information regarding when Molard first realized that she had been injured. She told Pilgrim that she did not feel any pain until one hour after the accident when she was home. Reports from her physician, however, state that she began to experience pain "immediately after the accident."[2] In any event, she went to the hospital the following day, where no obvious structural damage was observed. Nevertheless, Molard continued to experience pain and was subsequently evaluated by a chiropractic doctor who diagnosed her with whiplash-related injuries. Molard began a regimen of physical therapy, massage, and muscle stimulation as prescribed by her doctor.

In the accident's aftermath, Molard consulted an attorney who, by letter dated October 30, 2002, sent Yellow Cab notice of Molard's claim for personal injury. The notice simply said that she had been injured on October 16 through the negligence of a Yellow Cab driver. Yellow Cab responded by saying that it was simply a dispatch service and could not ascertain the identity of the cab driver without the driver's name or the name of the owner. The record does not reveal that Molard's attorney provided Yellow Cab with any further information about the time and place of the accident or Molard's origin or destination, or that the attorney made any effort to determine whether Yellow Cab had dispatch records from which, with appropriate information, the cab could be identified.

For the next eight months, neither Molard nor her attorneys made any effort to discover the identity of the errant cab driver. Then, by letter dated June 27, 2003, Molard's attorney sent Pilgrim a claim for uninsured motorist benefits under the policy Pilgrim had issued to Molard's mother. This notice, unlike the notice the attorney had sent Yellow Cab, contained both the date and time of the accident, and said that it had happened on Route 290, that Molard had been a passenger in the taxi which was driven by an unknown white male, and that the taxi had been "struck by a motor vehicle operated by an unknown female and owned by an unknown person."[3] The notice, however, gave

---

[2]Pilgrim filed the reports, without objection, as part of its summary judgment papers. See G. L. c. 233, § 79G; *Madsen* v. *Erwin*, 395 Mass. 715, 721 (1985).

[3]Molard's later testimony under oath contradicted that version of how the accident occurred. See note 1, *supra*.

no policy number and misspelled the name of the insured as "Marie P*o*verge."[4]

After Pilgrim made several requests for additional information and after the passage of seven more months, Molard's attorney sent Pilgrim a second claim notice, this one dated February 6, 2004, and correctly spelling P*u*verge's name. The notice again stated that Molard had been a passenger in a Yellow Cab taxi driven by an unidentified white male driver when it was struck by a motor vehicle driven by an unknown driver.[5]

After receipt of the second notice, Pilgrim commenced an investigation into the accident. An adjuster contacted the registry of motor vehicles, State police, and local police, none of whom had any report of the accident. Pilgrim also subpoenaed and noticed a deposition of the Yellow Cab record keeper, although the contents of the subpoena are not in the record. Yellow Cab responded with a denial of any "knowledge [of] or responsibility or connection" to the October 16 accident.[6] It does not appear that the deposition was ever taken or that Pilgrim made any further effort to obtain information from Yellow Cab.

On November 2, 2004, Pilgrim conducted an examination under oath of Molard, who, for the first time, provided additional detail about the accident, including how the accident occurred, a general description of the driver, where she was coming from and going to, that she had telephoned for the cab and not simply hailed it on the street, and that the dispatcher had provided the cab driver with her destination.

*2. Policy provisions.* As stated, the policy Pilgrim had issued to Puverge was a standard Massachusetts automobile insurance policy, seventh edition, and, insofar as is relevant here, provided

---

[4]Pilgrim claims that, as a result of the spelling error, it was unable to identify the policy it had issued to Puverge. On this record, however, the precise effect of the misspelling is unclear because the policy's coverage selections page states that the policy had been issued to "Marie A. P*a*verge," a third variant of Puverge's name, although the driver of the automobile the policy covered was correctly listed on the page as "Marie A. Puverge." Neither party has addressed the impact, if any, of the "P*a*verge" variant.

[5]See notes 1 and 3, *supra*.

[6]The authority under which the subpoena was issued is not clear from the record, for Yellow Cab's response is dated April 4, 2004, about eight months before this action was commenced.

coverage for accidents involving "uninsured or hit-and-run autos" if "the injured person is legally entitled to recover from the owner or operator of the uninsured or hit-and-run auto." The policy also provided that Pilgrim would pay for "hit-and-run accidents only if the owner or operator causing the accident cannot be identified."

The Pilgrim policy also contained a notice provision specifically applicable to "hit-and-run" accidents as well as a more general notice provision applicable to all accidents. With respect to hit-and-run accidents, the policy said:

> "Within 24 hours, notify both the police and us if . . . you[7] have been involved in a hit-and-run accident."

More generally, the policy said that Pilgrim or its agents

> "must be notified promptly of the accident or loss by you or someone on your behalf. The notification should include as many details as possible . . . . If you *or any person seeking payment under this policy* fail to notify us promptly of any accident or claim . . . we may not be required to pay claims . . ." (emphasis supplied).

3. *Prior proceedings.* Pilgrim ultimately denied coverage for Molard's claim principally on the basis that it had been prejudiced by untimely notice. Subsequently, Pilgrim commenced an action in Superior Court seeking a declaratory judgment exonerating it from liability. Molard and Puverge filed a counterclaim seeking a declaration of coverage. After hearing cross motions for summary judgment, a Superior Court judge entered an order declaring that, although Molard's injuries were properly viewed as the product of a hit-and-run accident, the policy provided her with no coverage because Pilgrim had been prejudiced by her delay in giving notice of the accident. Judgment to that effect followed, as did this appeal.

---

[7]The policy defined "you" as "the person[] named in Item 1 of the Coverage Selection Page." In this case, that person was Molard's mother, Puverge. None of the parties has focused on whether the provision imposed an obligation on Molard or Puverge or both, or, if only on Puverge, what impact her failure to comply with the provision may have had on Molard's claim. We need not struggle with those issues, however, for the general notice provision, by its terms, imposed a notice obligation on Molard.

On appeal, Molard contends that the motion judge was in error when he concluded that there was no genuine issue of material fact with respect to the prejudice Pilgrim suffered as a result of her late notice.[8] Defending the judgment it obtained, Pilgrim asserts that, at the very least, Molard will not be able to show at trial that there was coverage under the policy and that, in any event, the judge rightly concluded that the undisputed facts showed prejudice as a result of the late notice.

4. *Coverage under the policy.* Dealing first with the coverage issue, we start with the familiar principle that "[a]n insured generally bears the burden of proving that a particular claim falls within a policy's coverage." *Allmerica Financial Corp.* v. *Certain Underwriters at Lloyd's, London,* 449 Mass. 621, 628 (2007). At the summary judgment stage, however, Pilgrim has the burden of affirmatively showing either that there is no coverage or that Molard will be unable to show at trial that coverage exists. *Kourouvacilis* v. *General Motors Corp.,* 410 Mass. 706, 716 (1991).

The coverage issue quickly reduces itself to the question whether the cab in which Molard was riding was a hit-and-run vehicle whose owner or operator "cannot be identified." That reduction occurs because it is clear from this record that, with no information about either vehicle involved in the accident, Molard will not be able to show at trial that either vehicle was "uninsured," see, e.g., *Dixie Ins. Co.* v. *Mello,* 75 Wash. App. 328, 335 (1994), and, given the undisputed evidence in the rec-

---

[8]Molard only challenges the judge's conclusion that her delay in giving notice to Pilgrim was prejudicial. With good reason, she did not challenge his conclusion that the notice to Pilgrim was untimely, i.e., that it did not come within twenty-four hours of the accident and was not prompt. Compare *Royal-Globe Ins. Co.* v. *Craven,* 411 Mass. 629, 633-634 (1992) (although twenty-four hour notice provision excused as insured was then in intensive care, notice given three months after release from hospital and four months after accident was not prompt). "The insurer's contractual right is to determine promptly — while the evidence and memories are still fresh — the validity of any loss for which it might become liable." *Mello* v. *Hingham Mut. Fire Ins. Co.,* 421 Mass. 333, 341 (1995). See *Royal-Globe Ins. Co., supra* at 632, quoting from *Monadnock Display Fireworks, Inc.* v. *Andover,* 388 Mass. 153, 157 (1983) ("[w]hat constitutes timely notice under the insurance policy is a matter of contract interpretation and is therefore 'a matter of law for the court' ").

ord regarding how the accident occurred, she will not be able to show that the minivan driver was in any way responsible.

The viability of Molard's coverage claim therefore turns on whether the taxi in which she was riding was an unidentifiable hit-and-run vehicle. Two decisions, both involving standard Massachusetts automobile policies, provide the principal framework for assessing that question. The first is *Surrey* v. *Lumbermens Mut. Cas. Co.*, 384 Mass. 171 (1981). There, the insured was driving an automobile when an oncoming vehicle forced her off the road and into a guardrail. *Id.* at 172. She was injured in the crash. *Id.* at 172 n.1. The oncoming vehicle made no contact with the insured automobile, did not stop, and was never identified. *Id.* at 172. In determining whether the hit-and-run provisions of the insured's own policy, which required physical contact with the hit-and-run vehicle, was enforceable, the Supreme Judicial Court had to determine whether that requirement conflicted with the uninsured motor vehicle statute, G. L. c. 175, § 113L. *Id.* at 172-173.

The court concluded that the policy and the statute were in conflict and that the policy's physical contact limitation was therefore unenforceable. *Id.* at 176. In so doing, the court observed that G. L. c. 175, § 113L(1), required coverage for hit-and-run accidents but, unlike a number of States having similar coverage requirements, did not define the term. *Id.* at 174-175. It then noted that the majority of States mandating hit-and-run coverage without a statutory definition of the term did not require physical contact as a trigger for coverage, *ibid.*, and instead construed the term as "synonymous with a car involved in an accident causing damages where the driver flees from the scene." *Id.* at 176, quoting from *Hartford Acc. & Indem. Co.* v. *Novak*, 83 Wash. 2d 576, 585 (1974). Broadly defining the term in that fashion, in the court's view, was consistent with the primary statutory purpose of "minimiz[ing] the catastrophic financial loss for victims of automobile accidents caused by the negligence of uninsured tortfeasors." *Id.* at 177.

The second of the two cases is *Commerce Ins. Co.* v. *Mendonca*, 57 Mass. App. Ct. 522 (2003), a case that has some similarities to this one. The insured in *Mendonca* was a passenger in a car that was stopped at a red light when it was struck from

behind by another vehicle. *Id.* at 522. The driver of the vehicle in which the insured was riding asked the insured if she were "okay" and, upon receiving an affirmative answer, got out of the car to talk to the other driver. *Id.* at 523. The two drivers, after inspecting their vehicles, concluded that there was no significant damage and drove away without exchanging identifying information. *Ibid.*

After the vehicles had gone their separate ways, the insured realized for the first time that she had been hurt and, because she then had no way to identify the driver of the other car, sought compensation under a policy Commerce had issued for her own motor vehicle. *Ibid.* That policy contained hit-and-run provisions identical to the provisions at issue here. See *id.* at 523 n.1.

Commerce resisted payment on the ground that the accident did not involve a hit-and-run vehicle because the driver who caused the accident stopped, and that, as a consequence, there was no coverage. *Id.* at 525. We rejected that argument, noting that *Surrey* had taken an expansive approach to the meaning of the term hit-and-run. *Id.* at 524. With that expansive approach in mind, we quoted with approval a neighboring jurisdiction's conclusion that

> "[a]n injured person who is not aware of his injury until it is too late to take steps to make the necessary identification is in precisely the same situation of deprivation of remedy as he would be if he knew he were hurt but the other driver left the scene without opportunity to identify him."

*Id.* at 525, quoting from *Riemenschneider* v. *Motor Vehicle Acc. Indemnification Corp.*, 20 N.Y.2d 547, 550 (1967).

Against the backdrop of *Surrey* and the expansive approach to the term hit-and-run that decision embodied, we concluded that construing the hit-and-run policy provisions to exclude any accident where drivers stopped and talked after the accident but failed to exchange identifying information

> "would leave a gap in mandated coverage by providing protection to a person injured by an identified, but un-insured, operator or by an operator whose postaccident

flight prevents identification, while denying protection when the operator does not immediately flee but nevertheless leaves the accident scene without being identified. Such a coverage gap is contrary to the general purpose of legislatively mandated liability and uninsured motorist insurance, which is to give some measure of financial protection to persons injured by the negligent driving of others."

*Mendonca,* 57 Mass. App. Ct. at 525-526.[9]

Although those conclusions disposed of the issues Commerce had raised in the appeal, we independently examined the policy provision limiting coverage for hit-and-run accidents to those in which "the owner or operator causing the accident cannot be identified." We concluded that "even if the words 'cannot be identified' were to be generously interpreted as imposing a due diligence duty on the operator of a vehicle which is in a collision with another vehicle to obtain identifying information if the other operator stops, such duty should not automatically be transferred to a passenger," at least to a passenger "who is unaware of an injury at the time of the collision." *Id.* at 526-527.

The *Surrey* and *Mendonca* decisions show that, because of the dominant compensatory purpose of G. L. c. 175, § 113L(1), the hit-and-run accident covered by the policy is, at its core, an accident with respect to which an injured person does not, and is not required to, obtain identifying information regarding the at-fault vehicle. Contact with the other vehicle is unnecessary as is the offending vehicle's flight from the scene. Moreover, at least if the injured person is a passenger in a vehicle and does not realize that he has been injured before the at-fault vehicle departs, he has no obligation to obtain identifying information about that vehicle.

*Surrey* and *Mendonca,* however, did not deal with the precise

---

[9]That is not the universal approach. Compare, e.g., *Sylvestre* v. *United Servs. Auto. Assn. Cas. Ins. Co.,* 240 Conn. 544, 546 (1997) (hit-and-run accident does not include incident in which at-fault driver stops but is dismissed by other party who does not obtain any identifying information); *Lhotka* v. *Illinois Farmers Ins. Co.,* 572 N.W.2d 772, 775 (Minn. Ct. App. 1998) (same).

issue this case raises because the at-fault vehicle in those cases was not the vehicle in which the insured was riding. However, the insured was riding in the at-fault vehicle in *Wilson* v. *Progressive N. Ins. Co.*, 151 N.H. 782 (2005), a hit-and-run case decided by the New Hampshire Supreme Court. There, the insured, accompanied by her dog, got into a taxicab. *Id.* at 783. The driver closed the door on the dog's tail, causing it to lunge toward the insured and bite her in the face.[10] *Ibid.* The driver immediately took the insured to a hospital where she was treated, but the driver left without providing any identifying information. *Ibid.* Later, the insured unsuccessfully tried to identify the cab, enlisting the help of the local police department and selectmen in doing so. *Id.* at 784. Because she could not identify the cab, the insured sought recovery for her injuries under the hit-and-run provisions of the automobile policy the insurer had issued to her. *Ibid.*

Rejecting the insurer's contention that the insured's injuries were not caused by a hit-and-run vehicle, the New Hampshire Supreme Court, relying in part on *Mendonca*, held that, given the broadly compensatory policies underlying coverage for hit-and-run accidents, the appropriate focus was on the at-fault driver's failure to provide identifying information before leaving the scene and not on "flight" in the commonly accepted sense of the term. *Id.* at 789-790. The court also held that the insured did not have an affirmative obligation to obtain identifying information from the cab driver because none of the policy provisions governing notice to the insurer, provisions similar to those in the policy at issue here, imposed "a responsibility on the part of the [insured], who was injured in the accident, to gather evidence at the scene." *Id.* at 790.

We think that the court's decision in *Wilson* is, on the facts of that case, a sound and logical extension of the holdings in *Surrey* and *Mendonca*. More specifically, we think that a passenger in an at-fault vehicle who is injured in an accident and who, unaware of her injuries or incapacitated by them, leaves the vehicle without obtaining identifying information about the

---

[10]We have held that, under appropriate circumstances, dog bites can arise out of "use" of a motor vehicle and, therefore, trigger coverage under an automobile policy. See *White* v. *American Cas. Ins. Co.*, 53 Mass. App. Ct. 66, 72 (2001).

vehicle is entitled to recover under the hit-and-run provisions of the policy.

At the same time, we also think that a passenger in an at-fault vehicle who realizes before leaving the vehicle that he has been injured has an obligation to gather information from which the vehicle and its driver can be readily identified if the nature of the injuries or other circumstances of the accident do not prevent him from doing so. Any other conclusion would completely read the words "cannot be identified" out of the policy and would give the injured person a choice between proceeding against the at-fault driver or his own insurer to obtain compensation for injuries the accident produced. Neither the broadly compensatory purpose of G. L. c. 175, § 113L(1), nor any other authority of which we are aware requires that automobile accident victims be given any such choice.

Accordingly, there is a genuine issue of material fact on the issue of coverage. Reports from Molard's physician say that she was aware of pain immediately after the accident and her own statement to Pilgrim reveals that she remained in the cab until it reached her destination some eight miles down the road. If that is so and if no other circumstances prevented her from obtaining information with which to readily identify the taxi, then her failure to obtain identifying information precludes coverage. If, on the other hand, Molard did not realize that she had been injured until after she reached her destination and the cab had departed, then the accident, on the present record, qualifies as a hit-and-run accident in which the at-fault vehicle cannot be identified, and coverage under the policy exists.

5. *Effect of late notice.* That brings us to the second of the two appellate issues, namely whether Molard's noncompliance with the policy's notice provisions prejudiced Pilgrim, for, although Molard's notice was untimely, Pilgrim can avoid liability only if it can show that the delayed notice actually prejudiced its interests. See G. L. c. 175, § 112, inserted by St. 1977, c. 437 ("An insurance company shall not deny insurance coverage to an insured because of failure of an insured to seasonably notify an insurance company of an occurrence, incident, [or] claim . . . unless the insurance company has been prejudiced thereby"); *Goodman* v. *American Cas. Co.,* 419 Mass. 138,

141-142 (1994) (insurer must prove prejudice from late notice to defeat uninsured motorist as well as liability claims). To prove prejudice, generalities are insufficient. Instead, the insurer must identify "the precise manner in which its interests have suffered." *Employers' Liab. Assur. Corp.* v. *Hoechst Celanese Corp.*, 43 Mass. App. Ct. 465, 476 (1997), quoting from *Darcy* v. *Hartford Ins. Co.*, 407 Mass. 481, 486-487 (1990). More specifically,

> "[a]n insurance company may only deny [coverage] because of the injured's failure to provide timely notice to the company if that delay materially prejudiced the company. Standing alone, length of time is insufficient to satisfy a showing that delay in notification materially prejudiced an insurer. This is true even if the delay could be fairly characterized as 'extreme.' Rather, delay is a relevant factor to be considered in combination with other facts or circumstances. The insurer bears the burden of identifying precisely how the delay has caused it to suffer prejudice."

*Lighter* v. *Lumbermens Mut. Cas. Ins. Co.*, 43 Mass. App. Ct. 415, 417 (1997) (citations omitted). See generally *Thompson* v. *Grange Ins. Assn.*, 34 Wash. App. 151, 163-164 (1983) (no presumption of prejudice where injured waited five years to notify insurer); *Canron, Inc.* v. *Federal Ins. Co.*, 82 Wash. App. 480, 490 (1996) (Washington law requires showing of actual prejudice).

Material prejudice from late notice is not a static concept and, instead, "depends upon the circumstances of the occurrence, and the nature of the risk covered as well as the purposes of the notice provision." 13 Couch, Insurance § 193:68, at 193-97 (3d ed. 2005) (footnote omitted). Accordingly, while length of delay in providing notice is not irrelevant to the question of prejudice,

> "before a denial of coverage by an insurer is justified, the delay in notice must be accompanied by a showing of some other facts or circumstances (such as, for example, the loss of critical evidence, or testimony from material witnesses despite diligent good faith efforts on the part of the insurer to locate them) which demonstrates that the insurer's interests have been actually harmed."

*Darcy, supra* at 486.

In this case, the notice provision was designed to enable Pilgrim to conduct an investigation to identify the at-fault vehicle, i.e., the taxicab, and thus to defeat liability under the policy's hit-and-run provisions by actually identifying that vehicle, and to determine whether the accident happened in the manner Molard claimed. To show prejudice, therefore, Pilgrim had to show precisely how Molard's late notice materially degraded its ability to achieve either of those objectives.

Upon receiving notice of the accident, Pilgrim learned that no official reports of the accident existed. Nothing in the record before us, however, suggests that any such reports ever existed, so Molard's late notice deprived Pilgrim of nothing it could have obtained had notice been given promptly. Nor is there any suggestion in the record that prompt notice would have enabled Pilgrim to locate any witnesses to the accident other than the taxi driver and Molard.

Insofar as the taxi driver is concerned, the record reflects that Yellow Cab told Molard's attorney that it was unable to provide any information about the accident without knowing the name of the driver of the cab or the cab's owner but, when Yellow Cab said that, all it knew was that Molard claimed to have been injured in an accident that "occurred on or about October 16, 2002." It knew of no time, place, or role allegedly played by a Yellow Cab. Later, after Pilgrim received Molard's claim notice, Pilgrim served what it claims was a deposition notice, the content of which the record does not disclose, on the keeper of the records of Yellow Cab. Instead of appearing or providing whatever records Pilgrim requested, Yellow Cab simply sent or delivered a letter saying, without elaboration, that it was a dispatching service and had no liability for the accident. The record reveals no follow-up by Pilgrim.

When Pilgrim examined Molard under oath seven months later, she provided substantially more information than she had at any earlier stage. As noted above, she told Pilgrim the time and location of the accident and how the accident occurred, gave a somewhat more precise, albeit still general, description of the driver, and, most important, said that she had given her destination to the dispatcher who had relayed it to the driver. That information raises a distinct possibility that a dispatcher's record might have

been created and that Yellow Cab, if provided with the date and time of the ride and Molard's destination, might have been able to identify the driver. The record is silent, however, with respect to what, if any, efforts Pilgrim made to supply Molard's amplified information to Yellow Cab in an effort to determine whether the cab could be identified from existing dispatch records; whether such records once existed and had been destroyed, and, if so, when; or whether no such records ever existed. Without that information, there is, at the very least, a genuine issue of material fact regarding whether Molard's late notice materially and adversely affected Pilgrim's investigatory efforts.

In sum, there is a genuine issue of material fact as to whether Molard had and fulfilled a duty to gather identifying information about the cab driver and whether Molard's late notice of the accident materially degraded Pilgrim's ability to conduct an appropriate investigation of her claim. Accordingly, entry of summary judgment in Pilgrim's favor was error. The judgment is vacated and the case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*